**UNITED STATES COURT OF INTERNATIONAL TRADE**

| |
|---|
| AFX LIGHTING INC. AKA DIODE LIGHTING INC AKA AFX AKA AFX INC., |
| *Plaintiff,* |
| v. |
| The UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY SCOTT, *in his official capacity as Commissioner of United States Customs and Border Protection*; DONALD J. TRUMP, *in his official capacity as President of the United States*; EXECUTIVE OFFICE OF THE PRESIDENT; JAMIESON GREER, *in his official capacity as United States Trade Representative*; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; HOWARD LUTNICK, *in his official capacity as Secretary of Commerce,* |
| *Defendants.* |

Court No.    26-cv- 01125

## <u>COMPLAINT</u>

Plaintiff AFX Lighting Inc. aka Diode Lighting Inc aka AFX aka AFX Inc., ("AFX" or "Plaintiff"), by and through its attorneys, alleges as follows:

1.    The President of the United States claims the authority to unilaterally levy tariffs on goods imported from any and every country in the world, at any rate, calculated via any methodology—or mere caprice—immediately, with no notice, or public comment, or phase- in, or delay in implementation, despite massive economic impacts that are likely to do severe damage to the global economy.

2.    If actually granted by statute, this power would be an unlawful delegation of legislative power to the executive without any intelligible principle to limit his discretion.

3.      But Congress has not delegated any such power. The statute the President invokes— the International Emergency Economic Powers Act ("IEEPA")—does not authorize the President to unilaterally issue across-the-board worldwide tariffs.

4.      Even if the statute did delegate such power—which it did not—the President's justification does not meet the standards set forth in the IEEPA. His claimed emergency is a figment of his own imagination: trade deficits, which have persisted for decades without causing economic harm, are not an emergency. Nor do these trade deficits constitute an "unusual and extraordinary threat." The President's attempt to use IEEPA to impose sweeping tariffs also runs afoul of the major questions doctrine.

5.      This Court should declare the President's unprecedented power grab illegal, enjoin the operation of the executive actions that purport to impose these tariffs under the IEEPA, and reaffirm this country's core founding principle: there shall be no taxation without representation and order the immediate refund, with interest, of all of the unlawful duties collected from plaintiff.

## **JURISDICTION**

6.      The Court has subject matter jurisdiction under 28 U.S.C. § 1581 because this action is commenced against an officer of the United States and arises out of an executive order providing for tariffs. 28 U.S.C. § 1581(i)(1)(B); *see Silfab Solar, Inc. v. United States*, 296 F. Supp. 3d 1296 (Ct Int'l Trade 2018).

7.      The Court possesses all the powers in law and equity of, or as conferred by statute upon, a district court of the United States. 28 U.S.C. § 1585. The Court may enter a money judgment for or against the United States in any civil action commenced under 28 U.S.C. § 1581 or 28

U.S.C. § 1582 and may also order any other form of relief that is appropriate in a civil action, including but not limited to declaratory judgments, orders of remand, injunctions, and writs of mandamus and prohibition. 28 U.S.C. §§ 2643(a)(1), (c)(1).

## **PARTIES**

8.      Plaintiff AFX is a privately-owned importer, and distributor of lighting products. Plaintiff AFX is therefore an interested party pursuant to 28 U.S.C § 2631(i).

9.      Defendant United States of America is the federal government of the United States of America.

10.      Defendant United States Customs and Border Protection ("CPB") is a federal agency and a component of the Department of Homeland Security, responsible for, among other things, securing ports of entry and collecting tariffs on imported goods. It is headquartered in Washington, D.C.

11.      Defendant Rodney Scott is the Commissioner of United States Customs and Border Protection. He is sued in his official capacity.

12.      Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

13.      Defendant Executive Office of the President is the federal agency that oversees core functions of the executive branch, including the Office of the United States Trade Representative. It is headquartered in Washington, D.C.

14.      Defendant Jamieson Greer is the United States Trade Representative and is sued in his official capacity.

15.    Defendant Office of the United States Trade Representative is the federal agency responsible for developing United States trade policy. It is headquartered in Washington, D.C.

16.    Defendant Howard Lutnick is the United States Secretary of Commerce and is sued in his official capacity.

## TIMELINESS OF THE ACTION

17.    A plaintiff must commence an action under 28 U.S.C. § 1581(i)(1)(B) "within two years after the cause of action first accrues." 28 U.S.C. § 2636(i).

18.    Plaintiff commenced this action by filing a summons and complaint with the Court on February 20, 2026.  As this matter has been commenced within two years of the action of the United States, such action satisfies the timeliness requirement in accordance with 19 U.S.C. § 1621.

## STANDING

19.    To establish standing, a plaintiff must show injury in fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992). Plaintiff is harmed by the challenged tariff action because Plaintiff directly imported goods from China and other countries subject to the Challenged Orders, and each thus must pay additional tariffs to the federal government because of the Challenged Orders and corresponding revisions to the HTSUS. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III."); *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 599 (2007) ("being forced to pay" money to the government "causes a real and immediate economic injury"). Declaratory and injunctive relief will redress these injuries because Plaintiff will no

longer be required to pay the tariff or make harmful changes to their business operations to account for increased costs.

## FACTS

1.      On February 1, 2025, the President issued Executive Order 14195, entitled "Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China" (the "China Executive Order").[1]

2.      The China Executive Order declared that a national emergency posed by the influx of illegal aliens and drugs into the United States applied to the Chinese government's failure to "arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other TCOs, criminals at large, and drugs." It declared that China's failure to act constituted "an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States."

3.      The China Executive Order imposed an incremental 10% tariff in addition to existing tariffs on all imports from China.

4.      On March 3, 2025, the President issued Executive Order 14228, entitled "Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China,"[2] which doubled the incremental tariffs on imports from China to 20%. As justification for the rate increase, it stated that the Chinese government had "not taken adequate steps to alleviate the illicit drug crisis."

---

[1] Available at https://www.whitehouse.gov/presidential-actions/2025/02/imposing- duties-to- address-the-synthetic-opioid-supply-chain-in-the-peoples-republic-of- china/.
[2] Available at https://www.whitehouse.gov/presidential-actions/2025/04/further- amendment-to- duties-addressing-the-synthetic-opioid-supply-chain-in-the-peoples- republic-of-china-as- applied-to-low-value-imports/.

5.    On April 2, 2025, "Liberation Day," the President issued Executive Order 14257, entitled "Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits" (the "Liberation Day Order").[3]

6.    The Liberation Day Order imposed sweeping new tariffs at rates not seen since the Great Depression—including a global 10% tariffs on nearly all countries in the world, regardless of whether they impose tariffs on United States products, the rates at which they do so, or the existence of any trade agreements governing the relationship. These tariffs even applied to places with no civilian population or international trade activity, such as the British Indian Ocean Territory, whose only human inhabitants belong to a joint American and British military base on the island of Diego Garcia, and the Heard and McDonald Islands, which are inhabited only by penguins and seals.

7.    In addition to the global 10% tariff, the Liberation Day Order levied much higher tariff rates on dozens of countries based on what the administration claimed to be an estimate of "tariff and nontariff barriers," but ultimately turned out to be a simple ratio of the trade deficit in goods (excluding services) as a percentage of total U.S. imports from the given country.

8.    The chosen formula is not an accepted methodology for calculating trade barriers and has no basis in economic theory.

9.    On April 9, 2025, the President issued an additional Executive Order, entitled "Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation And Alignment,"[4]

---

[3] Available at https://www.whitehouse.gov/presidential-actions/2025/04/regulating- imports- with-a-reciprocal-tariff-to-rectify-trade-practices-that-contribute-to-large- and-persistent-annual- united-states-goods-trade-deficits/.
[4] Available at https://www.whitehouse.gov/presidential-actions/2025/04/modifying- reciprocal- tariff-rates-to-reflect-trading-partner-retaliation-and-alignment/.

which paused the elevated tariff rates on most countries for 90 days, while leaving the global 10% tariff in place for all countries.

10.     The April 9 Order did not reduce the tariff rate applied to imports from China. Instead, it imposed a new, higher tariff rate of 125% on Chinese goods in retaliation for China's imposition of its own tariffs in response to the President's imposition of elevated tariffs on China. The tariff rate imposed on China was later increased to 145%.

11.     On April 11, 2025, the President issued a Memorandum entitled "Clarification of Exceptions Under Executive Order 14257 of April 2, 2025, as Amended,"[5] providing clarification of allowable exceptions under the Liberation Day Order. The Memorandum states that "semiconductors," defined as including products classified in various headings and subheadings of Chapters 84 and 85 of the Harmonized Tariff Schedule of the United States (HTSUS), are exempted from the tariffs imposed by the Liberation Day Order.

12.     On May 12, 2025, the President issued Executive Order, entitled "Modifying Reciprocal Tariff Rates to Reflect Discussion with the People's Republic of China,"[6] lowering the IEEPA Reciprocal tariff of Chinese goods from 125% to 10%. However, the 20% tariff imposed by Executive Order 14228, entitled "Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China," continued to exist.

13.     On July 30, 2025, the President issued Executive Order 14323, entitled "Addressing Threats to the United States by the Government of Brazil,"[7] which imposed an

---

[5] Available at https://www.whitehouse.gov/presidential-actions/2025/04/clarification-of- exceptions-under-executive-order-14257-of-april-2-2025-as-amended/.

[6] Available at https://www.whitehouse.gov/presidential-actions/2025/05/modifying-reciprocal- tariff-rates-to-reflect-discussions-with-the-peoples-republic-of-china/.

[7] Available at https://www.whitehouse.gov/presidential-actions/2025/07/addressing-threats-to- the-us/.

additional 40% tariff on imports from Brazil. This Executive Order cited the political prosecution of former President Jair Bolsonaro, which constituted "an unusual and extraordinary threat," as the reason for this additional tariff. *Id.*

14.     On July 31, 2025, the President issued Executive Order 14257, entitled "Further Modifying the Reciprocal Tariff Rates,"[8] which reinstated the country-specific IEEPA Reciprocal tariff. Imports from countries covered by Executive Order 14257 were imposed with a tariff rate of at least 10%.

15.     Also on July 31, 2025, the President issued Executive Order, entitled "Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border,"[9] which imposed an additional 25% tariff on imports from Canada, effectively raising the tariff on Canada to 35%.

16.     On August 6, 2025, the President issued Executive Order 14329, entitled "Addressing Threats to the United States by the Government of the Russian Federation."[10] This Executive Order imposed an additional 25% tariff on imports from India for "directly or indirectly importing Russian Federation oil." *Id.*

17.     On August 11, 2025, the President issued Executive Order 14358, entitled "Further Modifying Reciprocal Tariff Rates to Reflect Ongoing Discussions with the People's Republic of China,"[11] extending the suspension of China's country-specific IEEPA tariff rate until November 10, 2025.

---

[8] Available at https://www.whitehouse.gov/presidential-actions/2025/07/further-modifying-the- reciprocal-tariff-rates/#top.
[9] Available at https://www.whitehouse.gov/presidential-actions/2025/07/amendment-to-duties- to-address-the-flow-of-illicit-drugs-across-our-northern-border-9350/.
[10] Available at https://www.whitehouse.gov/presidential-actions/2025/08/addressing-threats-to- the-united-states-by-the-government-of-the-russian-federation/.
[11] Available at https://www.whitehouse.gov/presidential-actions/2025/08/further-modifying- reciprocal-tariff-rates-to-reflect-ongoing-discussions-with-the-peoples-republic-of-china/.

18.     On November 4, 2025, the President issued Executive Order 14357, entitled "Modifying Duties addressing the Synthetic Opioid Supply Chain in the People's Republic of China,"[12] reducing the 20% additional tariff (imposed by Executive Order 14228, "Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China") to 10%.

19.     Additionally, on November 4, 2025, the President issued Executive Order 14358, entitled "Modifying Reciprocal Tariff Rates Consistent With the Economic and Trade Arrangement Between the United States and the People's Republic of China," further extending the suspension of China's country-specific IEEPA tariff rate until November 10, 2026.

20.     On November 14, 2025, the President issued Executive Order entitled "Modifying the Scope of the Reciprocal Tariff with Respect to Certain Agricultural Products" amending the scope of products covered by IEEPA Reciprocal tariffs imposed by the Liberation Day Order.

21.     As a statutory basis, the Liberation Day Order, Executive Order 14323, Executive Order 14257, and Executive Order 14329 all cite the International Emergency Economic Powers Act of 1977, 50 U.S.C. § 1701 et seq. ("IEEPA"), the National Emergencies Act, 50 U.S.C. § 1601 et seq., section 604 of the Trade Act of 1974, as amended, 19 U.S.C. § 2483, and section 301 of title 3, United States Code.

22.     None of these statutes grants the President the authority to impose tariffs, and the extent that the provide for any relief, there must be an actual "emergency". Such statutes do not permit the taking of relief on an unsupported pretext.

---

[12] Available at https://www.whitehouse.gov/presidential-actions/2025/11/modifying-duties-addressing-the-synthetic-opioid-supply-chain-in-the-peoples-republic-of-china/.

23.     The Constitution explicitly reserves to Congress the power to "lay and collect taxes, duties, imposts and excises," and "[t]o regulate commerce with foreign nations." U.S. Const. art. I, § 8 cl.1, 3.

24.     Title 19 of the United States Code, "Customs and Duties," (as opposed to Title 50, "War and National Defense") is where one would expect to find such presidential authority, but it makes no mention of such authority.

25.     Congress knew how to grant the President tariff authority if it wanted to.

26.     Under 19 U.S. Code § 1862, the President has a clear framework for adjusting duties and import restrictions for the purpose of "safeguarding national security." Yet the President has attempted to avoid that framework by stretching Congress's specific grant of emergency authority into general tariff authority. *See Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin.*, 595 U.S. 109, 125 (2022) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)) (Congress "does not . . . 'hide elephants in mouseholes'").

27.     Other specific grants of authority for the President to impose tariffs in limited specific circumstances exist. Under 19 U.S.C. § 2411, the President may impose tariffs on other countries that have violated trade agreements. And the President may provide specific, targeted relief to industries that need time to adjust to foreign competition pursuant to 19 U.S.C. § 2251.

28.     IEEPA provides that the President may:

(A)     investigate, regulate, or prohibit—

     (i)     any transactions in foreign exchange,

     (ii)     transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

10

    (iii)   the importing or exporting of currency or securities, by any person, or with respect to any property, subject to the jurisdiction of the United States;

(B)    investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States . . . .

50 U.S.C. § 1702.

29.    IEEPA further provides that these authorities "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C. § 1701(b).

30.    The word "tariff" does not appear in the IEEPA, nor does any synonym or equivalent.

31.    No previous President has used IEEPA to impose tariffs, except for President Trump himself briefly during his first term, in an executive action that was withdrawn before it was fully implemented or subject to judicial review. Tom Campbell, Presidential Authority to Impose Tariffs, 83 La. L. Rev. 596, 597 (2023).

32.    The "unusual and extraordinary threat" asserted as a "national emergency" by the Liberation Day Order is not an emergency, and is not unusual, extraordinary, new, unexpected, odd, or even surprising.

33.    According to the Liberation Day order, the President

find[s] that underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits, constitute an unusual and extraordinary threat to the national security and economy of the United States. That threat has its source in

11

whole or substantial part outside the United States in the domestic economic policies of key trading partners and structural imbalances in the global trading system. I hereby declare a national emergency with respect to this threat.[13]

34.    In other words, the national emergency claimed to be unusual and extraordinary in this case is the existence of bilateral trade deficits in goods (excluding services, for which the United States runs a trade surplus with the world) with some foreign trading partners.

35.    Trade deficits are not unusual or extraordinary—the United States has run a net trade deficit at most times since World War II, and consistently since the 1970s. Brian Reinbold, Yi Wen, *Historical U.S. Trade Deficits*, Federal Reserve Bank of St. Louis, May 17, 2019.[14] That necessarily includes bilateral trade deficits with many individual nations.

36.    Nor are trade deficits an emergency or even necessarily a problem; they simply mean that some other country sells lots of things Americans want to buy, or that its people are unwilling or unable (often because of poverty) to purchase many American goods.[15] Moreover, trade deficits go hand in hand with capital surpluses, which increases investment in the United States. Norbert Michel, *Trade and Investment Are Not a Balancing Act*, Cato Institute, Nov. 9, 2023.[16]

37.    Section 604 of the Trade Act of 1974 provides that "[t]he President shall from time to time, as appropriate, embody in the Harmonized Tariff Schedule of the United States

---

[13] Available at https://www.whitehouse.gov/presidential-actions/2025/04/regulating- imports- with-a-reciprocal-tariff-to-rectify-trade-practices-that-contribute-to-large- and-persistent-annual- united-states-goods-trade-deficits/.
[14] Available at https://www.stlouisfed.org/on-the-economy/2019/may/historical-u-s- trade-deficits.
[15] Economists generally agree bilateral trade deficits are not a meaningful problem at all, much less an emergency or an extraordinary and unusual threat. For overviews, see James McBride and Andrew Chatzky, *The U.S. Trade Deficit: How Much Does It Matter?*, Council on Foreign Relations (2019), available at https://www.cfr.org/backgrounder/us-trade-deficit-how-much- does-it-matter (noting that most economists recognize bilateral trade deficits do not matter, and the overall trade deficit is determined mainly by macroeconomic forces); Michael Chapman, *Ignore the Politicians: Trade Deficits Don't Really Matter*, Cato Institute (Aug. 29, 2024), available at https://www.cato.org/blog/ignore-politicians-trade- deficits-dont-really-matter (summarizing standard economic analysis showing that trade deficits don't matter).
[16] Available at https://www.cato.org/policy-analysis/trade-investment-are-not-balancing-act.

the substance of the relevant provisions of this chapter, and of other Acts affecting import treatment, and actions thereunder, including removal, modification, continuance, or imposition of any rate of duty or other import restriction." 19 U.S.C. § 2483.

38.    Section 604 is a bookkeeping provision: it assigns to the President the task  of periodically updating the Harmonized Tariff Schedule to reflect changes in policy that have occurred. It does not set out any power, authority, or process by which the President may unilaterally set such policies.

39.    The National Emergencies Act, 50 U.S.C. § 1601 et seq., provides the general framework for declarations of national emergencies. It explicitly disclaims granting any substantive authority itself, instead requiring that "[w]hen the President declares a national emergency, no powers or authorities made available by statute for use in the event of an emergency shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act." 50 U.S.C. § 1631.

40.    3 U.S.C. § 301 gives the President "[g]eneral authorization to delegate functions" to subordinate federal officials. It has nothing to do with tariffs or trade regulation.

## STANDARD OF REVIEW

41.    The Administrative Procedure Act ("APA"), codified at 5 U.S.C. § 706, provided that the Court has the authority to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

42.    The court presumes judicial review of the President's action under the APA is available. *Patel v. Garland*, 596 U.S. 328, 346 (2022). *See USP Holdings, Inc. v. United States*,

36 F.4th 1359, 1366 (Fed. Cir. 2022) (holding that actions challenging the President's violation of the statutory authority delegated to him are subject to judicial review); *Florsheim Shoe Co. v. United States*, 744 F.2d 787, 795 (Fed. Cir. 1984) ("[T]he Executive's decisions in the sphere of international trade are reviewable only to determine whether the President's action falls within his delegated authority, whether the statutory language has been properly construed, and whether the President's action conforms with the relevant procedural requirements."); *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985) ("For a court to interpose, there has to be a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority."); *United States v. Sears, Roebuck & Co.*, 20 C.C.P.A. 295, 305 (1932) (reviewing the President's issuance of a proclamation "for the purpose of determining whether he has exceeded the powers delegated to him.").

43.     Pursuant to 28 U.S.C. § 1585, the Court possesses all the power in law and equity of a United States district court.

## CLAIMS

### COUNT I:
**The President's Action Levying Tariffs Exceeds His Statutory Authority.**

44.     The allegations of paragraphs 1 through 43 are incorporated by reference and restated as if fully set forth herein.

45.     Presidential authority to unilaterally impose worldwide tariffs, if Congress were to grant it at all, must be granted clearly and unmistakably—not through some implication so vague and indeterminate that it went unnoticed by every other President for nearly five decades. *See Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin.*, 595 U.S. at 125 (quoting *Whitman*, 531 U.S. at 468) ("Congress does not usually 'hide elephants in mouseholes.'").

46.     IEEPA does not mention tariffs or duties, nor at any point does it suggest that it is granting the power to lay and collect such.

47.     There is no precedent for using IEEPA to impose tariffs. No other President has ever done so or ever claimed the power to do so.

48.     The existence of trade deficits in goods with some other countries does not qualify as a national emergency, as required by IEEPA.

49.     The prosecution of the former leader of a third-country for corruption does not constitute a national emergency nor is it an unusual and extraordinary threat, as required by IEEPA.

50.     Courts are generally skeptical of newly claimed grants of authority discovered for the first time in decades-old statutes. Utility Air Regulatory Group v. EPA, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' . . . we typically greet its announcement with a measure of skepticism.") (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).

51.     Indeed, Congress passed IEEPA to limit what it saw as presidential abuses of emergency authorities in the years prior to 1977. Peter E. Harrell, The Case Against IEEPA Tariffs, Lawfare, Jan. 31, 2025.[17]

52.     Congress knows how to grant the President authority to impose or adjust tariffs when it wishes to, and it has done so in more limited statutes contained in Title 19 of the United States Code. But the President has decided to avoid the limits on his authority imposed by Congress by finding a new never-before-seen authority under IEEPA.

---

[17] Available at https://www.lawfaremedia.org/article/the-case-against-ieepa-tariffs.

53.     The President's interpretation of IEEPA is not entitled to deference—rather, it is the duty of the courts to independently "determine the best reading" of the statute at issue. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400 (2024).

54.     IEEPA does not grant the President power to impose tariffs at all—it does not mention such a power or imply it. The President's actions exceed the statutory authority Congress granted him.

55.     "Courts expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716 (2022) (cleaned up) (quoting *Utility Air Regulatory Group v. EPA*, 573 U. S. 302, 324 (2014)). The assertion that IEEPA grants the President his claimed authority raises a major question that requires Congress to speak clearly in granting such a broad and consequential power to upend the global economy.

56.     "In the absence of a clear mandate in the Act, it is unreasonable to assume that Congress intended to give the [President] the unprecedented power over American industry that would result from the Government's view." *Indus. Union Dep't, AFL-CIO v. API*, 448 U.S. 607, 645 (1980). If anything qualifies as a "decision . . . of vast economic and political significance," requiring a clear statement under the major question doctrine, this is it. *West Virginia*, 597 U.S. at 716.

57.     The Liberation Day Order would impose an estimated average of almost $1,300 in new taxes per year on American households, for a total tax burden of some $1.4 to 2.2 billion over the next ten years, reducing US gross domestic product by some 0.8%

(without accounting for retaliation by foreign states). Erica York & Alex Durante, *Trump Tariffs: The Economic Impact of the Trump Trade War,* Tax Foundation, Apr. 11, 2025.[18]

58.     This impact is at least as large—and likely much larger—than executive actions previously found by the Supreme Court to be "major questions," requiring a clear statement by Congress to authorize executive discretion. *See, e.g., Biden v. Nebraska*, 600 U.S. 477 (2023) (approximately $400 billion in student loan forgiveness); *West Virginia v. Environmental Protection Agency*, 597 U.S. 697 (2022) (EPA authority to regulate carbon emissions where the administration had not offered a specific emission reduction plan); *Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin.*, 595 U.S. 109 (2022) (pandemic-era vaccination mandate for workers employed by firms with 100 or more employees); *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021) (temporary pandemic-era nationwide eviction moratorium).

59.     The tariffs illegally imposed by the President via IEEPA directly and irreparably harm Plaintiff, who will face increase costs for the goods it sells, less demand for its higher priced products, and disrupted supply chains, among other threats to its livelihood, up to and including potentially bankrupting otherwise solvent companies.

## COUNT II:
### If the IEEPA Grants Broad, Unlimited Authority to Issue Tariffs Worldwide to the President, It Is an Unconstitutional Delegation of Legislative Authority

60.     The allegations of paragraphs 1 through 59 are incorporated by reference and restated as if fully set forth herein.

---

[18] Available at https://taxfoundation.org/research/all/federal/trump-tariffs-trade- war. These estimates include the impact of a few smaller tariff increases adopted by the administration under IEEPA, but most of the effect is from the Liberation Day Order.

61.    Article I, Section 1 of the Constitution provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1.

62.    The nondelegation doctrine is at bottom an attempt to take this provision seriously: there are legislative powers to make laws, and all such power resides in the Congress. *See Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 74 (2015) (Thomas, J., concurring) ("[T]he separation of powers is, in part, what supports our enduring conviction that the Vesting Clauses are exclusive and that the branch in which a power is vested may not give it up or otherwise reallocate it.").

63.    Implicit in this setup is the premise that neither branch may delegate its sphere of power to any other. "The Vesting Clauses, and indeed the entire structure of the Constitution, make no sense [if there is no limit on delegations]." Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327, 340 (2002).

64.    "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989).

65.    The Court therefore requires that any grant of regulatory authority be provided with an "intelligible principle" that will form the basis of agency action. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 430 (1935).

66.    The basic requirement that derives from the Supreme Court's cases is that "Congress must set forth standards sufficiently definite and precise to enable Congress, the courts, and the public to ascertain whether Congress's guidance has been followed*." Gundy*

*v. United States*, 588 U.S. 128, 158 (2019) (Gorsuch, J., dissenting) (quoting *Yakus v. United States*, 321 U. S. 414, 426 (1944)).

67.    IEEPA does not authorize tariffs at all, and this Court should so hold, by applying the rule of constitutional avoidance if necessary. But even if IEEPA did grant the President the broad, standardless discretion he claims—which it does not—and had done so clearly enough to satisfy the major questions doctrine—which it has not—it would be an unlawful delegation of legislative authority without any intelligible governing principle.

66. If there are any constitutional limits to delegation at all, they apply here, in a case where the executive claims virtually limitless authority to impose massive tax increases and start a worldwide trade war. This is the most "sweeping delegation of legislative power" claimed by the executive since the Supreme Court invalidated the National Recovery Act in 1935. *Schechter Poultry*, 295 U.S. at 539; *see id*. at 542 (noting that the NRA gave the "virtually unfettered'' discretion to the President "in approving or prescribing codes, and thus enacting laws for the government of trade and industry throughout the country").

68.    "The Government's theory would give [the President] power to impose enormous costs that might produce little, if any, discernible benefit." *Indus. Union Dep't*, 448 U.S. at 645.

69.    This interpretation would render the Act the equivalent of the delegations the Supreme Court previously struck down, "one of which provided literally no guidance for the exercise of discretion, and the other of which conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman*, 531 U.S. at 474.

70.    This interpretation of the IEEPA would constitute a "sweeping delegation of legislative power" of the kind rejected in previous Supreme Court cases. *Indus. Union Dep't*, 448 U.S. at 646 (quoting *Schechter Poultry*, 295 U.S. at 539).

71.    If longstanding, perfectly normal, bilateral trade deficits qualify as an "emergency" and as an "unusual and extraordinary threat," the same can be said of virtually any international economic transaction that the President disapproves of for virtually any reason. The President would have the power to impose any level of tariffs on goods or services from any country, for any purpose, pretty much anytime he wants.

72.    The sheer breadth of this claimed power—to impose tariffs at any level on any country at any time, at levels that could very well crash the global economy— counsels against reading IEEPA to confer such an extreme delegation of authority. *Crowell v. Benson*, 285 U.S. 22, 62 (1932) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.").

73.    IEEPA provides no intelligible principle for the imposition of tariffs—indeed, it provides no principle at all by which this Court, or anyone else, might determine whether the guidance Congress provided has been followed.

74.    The tariffs illegally imposed by the President via the unconstitutional delegation of authority under IEEPA directly and irreparable harm Plaintiff, who will face increase costs for the goods it sells, less demand for its higher prices products, and disrupted supply chains, among other threats to its livelihood, up to and including potentially bankrupting otherwise-solvent companies.

## COUNT III:
### Declaratory Relief Under 28 U.S.C. § 2201

75.    Plaintiff incorporates paragraphs 1-74 above by reference.

76.    Federal courts have the power "to declare the rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C. § 2201(a).

77.    Plaintiff's claims present an actual controversy as to the President's authority under IEEPA, the constitutionality of IEEPA, and the authority of CBP to implement and collect the resulting tariffs.

78.     Plaintiff is an importer of record and has suffered injury by having been required to pay IEEPA duties as a result of the Challenged Tariff Orders on goods it has imported into the United States.

79.    This Court can exercise its equitable power to enter a declaratory judgment that the Challenged Tariff Orders are unlawful for any of the above reasons, and that CBP lacks authority to implement and collect the resulting tariffs, as to Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court grant the following relief:

a.    Declare that IEEPA grants the President no statutory authority to unilaterally impose tariffs;

b.    Declare that the President has not identified a valid national emergency as required by IEEPA and that the continued existence of trade deficits in goods is not in and of itself a national emergency;

c.    Declare that the President has failed to make any showing of an "unusual and extraordinary threat" as required by IEEPA;

d.    Declare that, if Congress has granted the President unilateral authority to impose

global tariffs of any amount at his whim, it is an unconstitutional delegation of legislative power;

e.  Enjoin the operation of the March 3, 2025, Executive Order entitled "Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China" with respect to the plaintiff in this action;

f.  Enjoin the operation of the April 2, 2025, Executive Order entitled "Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits" with respect to the plaintiff in this action;

g.  Enjoin the operation of the April 9, 2025, Executive Order entitled "Modifying Reciprocal Tariff Rates To Reflect Trading Partner Retaliation And Alignment" with respect to the plaintiff in this action;

h.  Enjoin the operation of the July 30, 2025, Executive Order entitled "Addressing Threats to the United States by the Government of Brazil" with respect to the plaintiff in this action;

i.  Enjoin the operation of the July 31, 2025, Executive Order entitled "Further Modifying the Reciprocal Tariff Rates" with respect to the plaintiff in this action;

j.  Enjoin the operation of the July 31, 2025, Executive Order entitled "Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border" with respect to the plaintiff in this action;

k.  Enjoin the operation of the August 6, 2025, Executive Order entitled "Addressing Threats to the United States by the Government of the Russian Federation" with respect to the plaintiff in this action;

l.  Award Plaintiff damages in the amount of any tariffs collected by Defendants

pursuant to the challenged orders and orders refunds thereof plus interest;

m.    Award Plaintiff other such damages as are appropriate;

n.    Award Plaintiff its attorneys' fees and costs under the Equal Access to Justice

Act, 28 U.S.C. § 2412(d), and any other applicable law; and

o.    Grant any such other relief as this Court may deem just or proper.

Respectfully submitted,

Date: _____February 20, 2026_____

_____
Eric R. Rock, Attorney

Rock Trade Law LLC
134 North LaSalle Street, Suite 1800
Chicago, Illinois  60602
312-824-6191 (telephone)
erock@rocktradelaw.com (e-mail)